Martin A. Sabelli (SBN 164772)
Law Offices of Martin A. Sabelli
740 Noe Street
San Francisco, CA 94114
Tel: (415) 298-8435
Fax: (415) 520-5810
Email: msabelli@sabellilaw.com

Richard G. Hullinger (SBN 294025)
Law Office of Richard G. Hullinger
1000 Brannan Street, Suite 488
San Francisco, CA 94103
Telephone: (415) 812-1759
Facsimile: (415) 522-1506
rgh.law@outlook.com

Attorneys for Defendant
HENRY JOVANY SEVILLA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HENRY JOVANY SEVILLA,<br><br>Defendant. | Case No. 19-CR-383 CRB<br><br>**HENRY SEVILLA'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>**Date: October 7, 2020**<br>**Time: 1:00 p.m.**<br>**Court: Hon. Charles R. Breyer** |

## I.   INTRODUCTION

Henry Sevilla grew up in extreme poverty in the mountains of Honduras. At 18 years he had a baby son and decided to travel North to the United States, despite the well-known risks of the journey, with the hope of supporting his family from afar. Regrettably, Mr. Sevilla did not find steady work here and, even more regrettably, experimented with drugs and became involved as a low-level street dealer (receiving drugs from another street dealer) in the large-scale drug offenses before the Court in this and other related cases.

In this respect – the context of related prosecutions – Mr. Sevilla played the smallest possible role: a street-level dealer of the type ordinarily prosecuted in state court. Despite this limited role, he has been charged federally and, by the time of sentencing, he will have spent 14 months in custody during the pandemic and now faces extended detention in immigration custody before being deported. These facts – detention during the pandemic and deportation – should, of course, factor into this Court's assessment of the severity of the punishment already imposed.

Based upon Mr. Sevilla's relatively less-culpable role in the larger drug trafficking operation, the need to avoid unwarranted sentencing disparities, and the harsh conditions of pretrial confinement, Mr. Sevilla respectfully requests that this Court find that a sentence of time served is sufficient, but not greater than necessary to accomplish the goals of sentencing in this case.

## II.    STATEMENT OF FACTS

On August 6, 2019, federal agents executed a search warrant at 1966 62nd Avenue, in Oakland, California. The search warrant was based upon investigation of codefendant, Arnold Cruz Rodriguez, who is linked to the residence and with Andy Reanos-Moreno and the larger drug trafficking operation. The evidence in the larger case suggested that Cruz Rodriguez obtained drugs from Reanos-Moreno and then provided them to Mr. Sevilla who then sold the drugs in small quantities on the street.

When agents arrived at the residence Mr. Sevilla was found and detained. In a bedroom of the residence agents discovered plastic baggies, a digital scale, and approximately 2.245 grams of cocaine and 11.668 grams of cocaine base. Indicia in the room and witness statements linked Mr. Sevilla to the room. Agents searched a shed in the yard and discovered an additional 141.56 grams of cocaine base. Suspected heroin was also discovered in the shed. Based upon the government's investigation, Mr. Sevilla was linked to the shed.

Mr. Sevilla has entered into a plea agreement with the government and intends to plead guilty to Counts One through Three of the Indictment, Possession with Intent to Distribute Controlled Substances, specifically methamphetamine (Count One), cocaine base (Count Two),

1  and cocaine (Count Three) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). The plea agreement
2  provides an Adjusted Offense Level 23.
3      A Pre-Plea Modified Presentence Investigation report was prepared in this case. The
4  Report indicates that Mr. Sevilla suffered California Penal Code § 32 felony conviction.
5  According to the San Francisco Police Report in that case, Mr. Sevilla and another man were
6  arrested by police in the Tenderloin for selling small bindles of cocaine base. Three Criminal
7  History points were assigned for this conviction and that Mr. Sevilla was on probation when he
8  was arrested in this case. Accordingly, Mr. Sevilla is a Criminal History Category II.

### III.     MR. SEVILLA'S PERSONAL CHARACTERISTICS AND BACKGROUND

#### A.     MR. SEVILLA GREW UP POOR IN RURAL HONDURAS

Henry Sevilla was born to Helario Sevilla (age 53), and Adelina Sevilla (age 53) on July 14, 1998, in a small rural town of approximately 200 people in Departamento de Francisco Morazán, in Honduras. Mr. Sevilla has three siblings: Maria De La Cruz Sevilla (age 18), Denia Patricia Sevilla (age 13), and Juan Eduardo Sevilla (age 8).

Like many of the people in Mr. Sevilla's community, his family was poor. His father worked in agriculture and his mother was a homemaker. Mr. Sevilla's family home had two bedrooms, a small living room, and an outdoor cooking area. The roof of their home was made of hardened dirt and plants that required frequent replacement to prevent rot.

In the sixth grade, Mr. Sevilla dropped out of school because his parents could not afford his school supplies, and he began working in construction and in the local fields planting beans, corn, and caring for cattle for the next several years. Although Mr. Sevilla was paid a meager wage, he helped support his family by contributing to the household bills and necessities. However, with only his father and Mr. Sevilla working, the family struggled to meet their basic needs. Had it not been for the tomatoes, potatoes, and fruit that they grew for personal use, they would not have had enough to eat.

///

///

///

### B. MR. SEVILLA'S LONG AND DANGEROUS JOURNEY TO THE UNITED STATES

The constant struggle of working long arduous hours in the field while barely being able to survive eventually drove Mr. Sevilla to immigrate to the United States at age 18. By then, Mr. Sevilla had fathered a son, Eric Isaac Sevilla-Lobo, and was hoping to obtain employment in the United States to help support his family and child.

Mr. Sevilla's immigration to the United States through Mexico was a long, dangerous, and traumatic experience. He endured the worst hunger he had ever experienced, often begging for food and money from locals to feed himself or pay for a room to sleep in. On most days Mr. Sevilla slept in the street, on trains, or under bridges, and showered when he could at migrant water stations. To travel north, Mr. Sevilla rode atop and inside freight trains that transported products and materials through Mexico. This form of transportation presented deadly risks for Mr. Sevilla and other migrants like himself. The process of climbing onto the trains, holding on, and jumping off them was, obviously, dangerous. On numerous occasions, Mr. Sevilla witnessed the gruesome death of migrants when they fell asleep and accidentally let go of rails and watched in horror as their bodies fell and were instantly dismembered.

Along the journey, Mr. Sevilla and others faced extortion, robberies, and assaults by gang members targeting immigrants. Twice, Mr. Sevilla was robbed at gunpoint and forced to give up the money he had earned working along the way. This, along with being hospitalized for appendicitis while in Mexico, held Mr. Sevilla back.

### C. MR. SEVILLA ARRIVES IN THE UNITED STATES

It took Mr. Sevilla a year to make it across Mexico to the U.S./Mexico border. While trying to cross, Mr. Sevilla was apprehended by Immigration and Customs Enforcement and transferred to the David and Margaret Youth and Family Services Center in La Verne, California, a non-profit organization that houses unaccompanied immigrant minors as well as provides adoptions and foster care services.

On September 2, 2018, Mr. Sevilla took an extended walk outside of the facility and ended up lost. He walked hours in search of the center but eventually gave up trying to find it,

1   instead making the decision to walk in the direction of Los Angeles, relying on freeway signs
2   to guide him. Mr. Sevilla embarked on his route to Los Angeles by walking along the highway
3   and sleeping under bridges. At one point, Mr. Sevilla was stopped and offered a ride by an
4   ambulance driver who saw him walking along the highway. With the help of the driver, Mr.
5   Sevilla was able to make it to a gas station where he met a Mexican national who sold flowers.
6   This individual introduced him to a flower shop owner who gave Mr. Sevilla work for several
7   days and eventually a ride to San Francisco, California, where he met with a female Honduran
8   friend of his uncle who offered him a place to stay for several months.

9   After a few months, Mr. Sevilla was able to get on his feet and moved in with other
10  Honduran nationals. Mr. Sevilla went on to obtain employment at a neighborhood market
11  where he worked approximately one-month cleaning and stocking shelves. However, his
12  employment was cut short when his symptoms of appendicitis resurfaced, and he had to take
13  extended time off. Mr. Sevilla went on to make a living cutting hair, a trade he had taught
14  himself in Honduras practicing on his father and others. Meanwhile, Mr. Sevilla sent money to
15  his family in Honduras to help support his son, parents, and siblings. A stipend they heavily
16  relied on.

17  It was around this time that Mr. Sevilla fell into selling drugs. He was arrested and
18  convicted in San Francisco in December 2018. Less than a year later he was arrested in this
19  case.

20  **IV.    ARGUMENT**
21      **A.    A SENTENCE OF TIME SERVED IS APPROPRIATE IN THIS CASE**
22  Consideration of Mr. Sevilla's (1) relative culpability within the larger drug trafficking
23  operation and the need to avoid unwarranted sentencing disparities, (2) background and age,
24  and (3) the harsh conditions of pretrial confinement all support a downward variance and a
25  sentence of time served (14 months) in this case.
26      **B.    APPLICABLE LAW**
27  When calculating the appropriate sentence, courts should calculate the applicable
28  Guideline range and "should then consider all of the [18 U.S.C.] § 3553(a) factors. . . ." *Gall v.*

5

*United States*, 128 S. Ct. 586, 596-597 (2007). The court is free to disagree with the Guidelines range and stated policy considerations. *Kimbrough v. United States*, 128 S. Ct. 558 (2007). The guideline range is not presumptively reasonable. Rather, the court "must make an individualized assessment." *Gall*, 128 S. Ct. at 596-597. "While the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (*en banc*). This discretion reflects the "federal judicial tradition" that allows "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. at 598 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996).

"(S)ection 3553(a) authorizes a sentencing judge to consider" the defendant's specific characteristics, such as "age, education, mental, or emotional condition, medical condition, employment history, lack of guidance as a youth, [and] family ties. . . ." *Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J., concurring). In this case, application of the Section 3553(a) factors supports a sentence of time served for Mr. Sevilla.

### 1. Mr. Sevilla Was A Low-Level Street Dealer

The evidence suggests that Mr. Sevilla received drugs from another street-level dealer, Cruz Rodriguez.[1] In other words, Mr. Sevilla was further down the distribution chain than other alleged street-level dealers. Furthermore, similarly situated codefendants in this case have received sentences approximately equal to the time Mr. Sevilla has already spent in custody.

| Name | Drug Quantity | Sentence |
|---|---|---|
| Allan Josue Funez Osorto (19-CR-381 CRB) | 1147.69 kg converted drug weight | 15 months imprisonment, 3 years supervised release |
| Brayan Martinez (19-CR-381 CRB) | 1076.55 kg converted drug weight | Time-served, 3 years supervised release |
| Jose Franklin Rodriguez Garcia (19-CR-381 CRB) | 1076.55 kg Converted drug weight | 12 months, 1-day imprisonment, 3 years supervised release |

---

[1] As provided in the chart included below, Cruz Rodriguez was recently sentenced to time served (13 months) for his role in the drug trafficking organization.

| Nicolas Soria (19-CR-381 CRB) | 497 g cocaine | Time-served, 3 years supervised release |
|---|---|---|
| Arnold David Cruz Rodriguez (19-CR-381 CRB) | Between 3,000 kg and 10,000 kg Converted drug weight | Time-served, 3 years supervised release |

Mr. Sevilla does have a recent conviction for drug-related conduct (CHC II), however, codefendant Allan Josue Funez Osorto, who was sentenced to 15 months in prison for over 1,000 kg of converted drug weight (or twice the amount attributed to Mr. Sevilla), was alleged to have had several drug-related arrests, had a firearm in the home, and was apparently a regular reseller for the drug trafficking organization.

Paradoxically, in this case, the fact of a prior conviction underscores the fact that Mr. Sevilla did not play a significant role in the any conspiracy; rather, the fact that he was convicted as a street-level dealer suggests that he was on the lowest end of the spectrum. Despite the technical impact a prior conviction has on the guidelines, the prior conviction speaks to Mr. Sevilla's relatively small role in the greater organization. Mr. Sevilla submits that this tension between the facts as they exist in the real world versus how these facts are treated under the guidelines highlights the wisdom of the system of advisory, rather than mandatory, sentencing guidelines.

### 2.    Mr. Sevilla's Age and Background Support a Downward Variance

As provided above, Mr. Sevilla grew up in chronic poverty. His parents and place of birth presented extreme barriers to meaningful opportunities to obtain the type of life many in this country take for granted. Of course, not every immigrant to the United States engages in illegal activity, and Mr. Sevilla takes full responsibility for his conduct, but it does provide context that mitigates the culpability of someone like Mr. Sevilla.

Further, Mr. Sevilla is young. He was barely 21 years old when he was arrested in this case. The Supreme Court's opinions regarding the science of brain development has evolved alongside the scientific research of the young adult brain. See, *e.g.*, *Roper v. Simmons*, 542 U.S. 551 (2005) (regarding the juvenile death penalty) and *Graham v. Florida*, 560 U.S. 48 (2010) (regarding life without parole for juveniles).

The Court has recognized the differences between young adults—from mature ones. The Court has consistently emphasized the tremendous capacity youthful offenders have to learn, change, and grow. The science embraced by the Supreme Court does not limit these lessons to only children or adolescents, it extends the lessons to emerging adults into their mid-twenties who have developing brains and will benefit tremendously from opportunities to grow and learn. See, *e.g.*, Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89, 152 (2009).

Thus, the Supreme Court and scientists in the field of adolescent brain development have acknowledged that people like Mr. Sevilla, a young man in his early twenties, who has experienced a life of chronic poverty and stress has undoubtedly lacked positive development. His impoverished upbringing ultimately drove him to immigrate from his native country to the United States without the proper resources. This experience exacerbated his childhood trauma by separating him from his family, victimizing him at the hands of robbers, and exposing him to the death and serious injury of others. In examining Mr. Sevilla's social history and age, it is reasonable to believe that his youth and immaturity were unquestionably connected to the commission of the instant offense and should be considered when determining the most appropriate sentence for him.

### 3. The Conditions of Pretrial Confinement Have Been Particularly Harsh

Mr. Sevilla has been in Santa Rita Jail since August 2019. As this Court is well aware, the jail has experienced significant disruption to inmate services. Further, social distancing protocols have meant that inmates are isolated and not permitted in common areas for extended periods of time. Finally, the psychological effect of over six months of fear and uncertainty brought on by the pandemic have taken its toll on Mr. Sevilla. Additionally, further imprisonment is unwarranted given that Mr. Sevilla will in all likelihood be deported back to Honduras after serving his sentence in this case.

## V. CONCLUSION

The past 14 months have taught Mr. Sevilla that he was heading down the wrong path in life. He has taken responsibility for his conduct and hopes to restart his life in Honduras with

his son and family. Mr. Sevilla respectfully requests that this Court find that a sentence of time served is sufficient, but not greater than necessary to accomplish the goals of sentencing and grant his motion for a downward variance in this case.

Dated: October 2, 2020                               Respectfully Submitted,

                                                     /s/*Richard G. Hullinger*
                                                     MARTÍN A. SABELLI
                                                     RICHARD HULLINGER
                                                     Attorneys for Henry Sevilla